BRIAN POULTER, State Bar No. 285108
brian@poulter.law
**POULTER & CO. TRIAL ATTORNEYS, INC.**
360 N Pacific Coast Highway, Suite 2000
El Segundo, California 90245
Telephone:   (310) 323 – 3029
Direct:         (310) 487 – 5501
Fax:             (310) 388 – 1201

Attorney for Plaintiff,
STEPHANIE KING

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE KING, an individual;<br><br>        Plaintiff,<br><br>        v.<br><br>THE BOEING COMPANY, a corporation; ALASKA AIRLINES, INC., a corporation; and DOES 1 through 20, Inclusive.<br><br>        Defendants. | Case No.:<br><br>COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL |

On the Complaint against Defendants The Boeing Company and Alaska Airlines, Inc. (together, "Defendants"), Plaintiff Stephanie King ("Plaintiff"), by and through their attorney, alleges as follows:

## I. INTRODUCTION

1.      This action arises from an explosive decompression event of a Boeing 737 aircraft. On January 5, 2024, Plaintiff Stephanie King was traveling from Portland to Ontario, California. Her parents were planning to pick her up from the Ontario airport upon arrival. She was not traveling for work or vacation but simply returning home after a trip she had taken with her boyfriend, who flew separately due to convenience—each departing from airports closer to their respective homes. Shortly after takeoff, at an altitude of approximately 16,000 feet, a plug door towards the rear of the aircraft blew out, which resulted in explosive and violent decompression of the aircraft cabin. The passengers nearest the gaping hole had shoes, cellphones, and other personal items sucked out the hole due to the explosive decompression. The sudden decompression was so strong it tore the shirt off a young passenger. Ms. King, seated in Row 10 on the right-hand side of the plane, could not initially see the source of the commotion but heard a loud bang and immediately sensed something was terribly wrong. Passengers screamed as belongings were ripped from the cabin and a young child's shirt was torn off by the force of the decompression. Screams of panic and

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

horror filled the plane. Ms. King prepared for the impending crash and certain death. Eventually it became apparent that the pilot had regained control of the aircraft and that an emergency landing would be made. Ms. King was traumatized by the horrible events of Flight 1282, and this trauma became more evident after she returned home.

## II. JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because complete diversity exists amongst the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

3.      Venue is proper in the Central District of California because Plaintiff is, and at the relevant time was, a resident of Los Angeles County.  Venue is also proper in the Central District of California because a substantial part of the events giving rise to the claim occurred in this district, including the plaintiff's purchase of the airline ticket in Walnut, California, and the intended arrival at Ontario International Airport, both located within the Central District.

4.      The Central District of California has personal jurisdiction over The Boeing Company and Alaska Airlines, Inc. because both defendants have substantial and continuous business contacts within California, including operating facilities, conducting flights, and engaging in commercial activities that

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

purposefully avail them of the privilege of conducting business in the state, thereby satisfying the "minimum contacts" standard.

### III. PARTIES

5.      Plaintiff Stephanie King ("Ms. King") is a citizen and resident of the State of California; she was a passenger on Alaska Airline Flight 1282.

6.      Defendant The Boeing Company ("Boeing") is, and was at all relevant times, a corporation incorporated under the laws of the State of Delaware; its principal executive offices are at 929 Long Bridge Drive, Arlington, Virginia; it is engaged in the business of manufacturing and selling commercial aircraft for transportation of paying passengers by air; it is authorized to do business, and does business, in the State of California; it may be served through its Registered Agent—1505 Corporation CSC - LAWYERS INCORPORATING SERVICE - 2710 GATEWAY OAKS DRIVE, SACRAMENTO, CA.

7.      Defendant Alaska Airlines, Inc. ("Alaska Airlines") is, and was at all relevant times, a corporation incorporated under the laws of the State of Washington; its principal place of business is at 19300 International Boulevard, SeaTac, Washington; it operates as a common carrier airline for the transportation of paying passengers by air; it is authorized to do business, and does business, in the State of California; it may be served through its Registered Agent—1505

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Corporation CSC - LAWYERS INCORPORATING SERVICE - 2710 GATEWAY OAKS DRIVE, SACRAMENTO, CA.

8.     The names of other defendants and/or their involvement in this dispute are presently unknown to Plaintiff, who therefore sues such defendants in this action by fictitious names. Each of the Defendants designated as DOES 1-10 is legally responsible in some manner for the unlawful acts described herein. Plaintiff will seek leave of the Court to amend this Complaint to reflect the true names and capacities of the DOE defendants when their identifies become known.

9.     Each defendant is the agent, servant and/or employee of other defendant and each defendant was acting within the course and scope of his, her, or its authority as agent, servant, and/or employee of the other defendant. Defendants, and each of them, are individuals, limited liability companies, or corporations which joined in and conspired with the other wrongdoers in carrying out the tortious and unlawful acts described herein, and Defendants, and each of them, ratified those acts.

## IV. FACTUAL ALLEGATIONS

### A. Boeing's History

10.     Founded in 1916, Boeing builds commercial aircraft and has dominated commercial aviation for decades. Boeing has grown to become a corporate icon of America, selling its aircraft in excess of 100 million dollars each.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

11.    A major competitor of Boeing, the Airbus Company ("Airbus"), began in Europe in 1970 as a minor manufacturer of commercial aircraft. Airbus' significance and influence grew as evidenced by the airline JetBlue, i.e., when it launched in 1999, its fleet of aircraft consisted exclusively of Airbus A320's. In 2008, Airbus delivered 483 airplanes. Boeing delivered only 375. Airbus had risen from obscurity and began challenging Boeing in the race for market share in commercial aviation. As a reaction to this intense competition, Boeing has taken shortcuts in certifying aircraft which has increased the danger to passengers.

12.    Boeing has been locked in a corporate struggle with Airbus over billions of dollars in commercial aviation profits. The high stakes corporate war has had real world consequences—lower sales for Boeing due to Airbus competition and lower profits. Lower profits translated into smaller executive compensation packages for Boeing executives responsible for making operational and safety decisions.

13.    Boeing had tools at its disposal that provided it with advantages over Airbus. Boeing could manipulate the certification process through its close contacts with the Federal Aviation Administration (herein "FAA"), particularly with the office in Seattle. Further, Boeing stressed a corporate culture of speed to increase profits. Boeing has ignored or silenced the voices of whistleblowers who raised safety concerns resulting from these practices.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

14.     Over time, the tools that aided Boeing in the war with Airbus led to enormous profits as evidenced by Boeing's stock price. In the past 10 years alone, Boeing's stock more than quadrupled in price from 100 to nearly 450 dollars per share. With executives paid in huge chunks of stock, Boeing executives profited handsomely from the massive increase in share price.

15.     In 2018, the top 5 executives at Boeing each earned over 7 million dollars in base pay, bonuses, stocks, and options. Boeing's CEO Dennis Muilenburg made over $23 million, a 27% increase in his salary over the previous year. $13.1 million of Muilenburg's salary was attributable to two bonus plans.

16.     One bonus plan was tied to targets for free cash flow, per-share earnings and revenue that were all exceeded. The other bonus plan was tied to a three-year economic profit goal which the company met. Thus, the only compensation incentives for Boeing executives were to hit sales and profitability targets which motivated them to focus more on those goals than safety. *See* Clough, Rick and Melin, Anders "Boeing Increases CEO's Pay 27% to $23.4 Million for Last Year" Bloomberg, Zhao, Jenn, March 15, 2019.

**B. Type Certification and the Boeing 737 Aircraft**

17.     The Boeing 737 aircraft record of tragic crashes manifests Boeing's systemic failure to provide adequate safety for people who fly aboard the Boeing

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

737 aircraft. This has caused 459 fatalities on Boeing 737 aircraft within the last 2 years.

18.     The first Boeing 737 received its type certification in 1967. It is certified under type certificate No. A16WE.

19.     Boeing debuted the 737 on January 17, 1967.

20.     The Boeing 737 flew for the first time on April 9, 1967.

21.     When it was first launched, the Boeing 737 was in direct competition with the British Aircraft's Corporations' BAC 1-11 and the Douglas Aircraft Company's DC-9.

22.     Boeing gave the 737 the same upper fuselage as the predecessor models 707 and 727 in order to get the plane to the market faster.

23.     Type Certificate No. A16WE covers the following "classic" models: 737-100, 737-200, 737-200C, 737-300, 737-400, 737-500. See, US Department of Transportation, Federal Aviation Administration. (February 15, 2018) Type Certificate Data Sheet (TCDS).

24.     The same Type Certificate No. A16WE also covers the following "Next Generation" models: 737-600, 737-700, 737-800, 737-800BCF, 737-900, 737-900ER. See, Id.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

25. Southwest Flight 1380 was a Boeing 737-700 aircraft. The 737-700 is certified under Type Certificate No. A16WE; the same type certificate as the 737 in 1967. See, Id.

26. In the race for commercial air supremacy, the use of type certification as a systematic shortcut to bring new products to the market faster and cheaper gave Boeing a competitive advantage.

27. By 1987, the 737 line was comprised of the 737-100, the 737-200 while the models in production included the 737-300, 737-400 and the 737-500. The 737 model was the most ordered plane in commercial history.

28. By 1993, Boeing was developing the "Next Generation" 737s. The 737-600, 737-700, 737-800 and the 737-900, all of which would also be certified under Type Certificate No. A16WE. See, Id.

29. Boeing brags on its website that Boeing (not the FAA which Boeing did not mention) "Certified and delivered the first three Next Generation models in less than one year."

30. In 2011, American Airlines, a long-time loyal customer of Boeing, informed Boeing that it intended to place a large order for the newer fuel-efficient Airbus A320's.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

31.    A few months later, in response to the Airbus pressure, Boeing conceived of a new fuel-efficient plane. As it had done in the past, Boeing opted to make renovations on the existing 737 rather than build a new plane.

32.    Like many of the predecessors including the 737-700, the 737-8 Max was added to the 737-type certificate. Instead of taking a decade to build and certify it, this cut the time in half.

33.    Further, adding the 737-Max to the 737 Type Certification benefited Boeing more than just by saving time with new design. Pilots could learn to use the modified plane in a fraction of the time that it takes to train a pilot in the use of a new plane, at least theoretically. Pilots were not required to train as long because the 737-8 Max was designed to be similar to the predecessor 737s.

34.    Saving five years in development is also extremely cost effective. With Airbus A320's in service and gathering market share, time and money were directly related.

35.    On March 8, 2017, the 737-8 Max received type certification approval under Type Certificate No. A16WE as amended. See, *Id.*

36.    Type Certificate No. A16WE as amended also covers the 737-9 Max. See, *Id.*

37.    The Maneuvering Characteristics Augmentation System (MCAS) is a computer system on board the 737-Max 8 which overrides the manual controls

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

when sensors perceive that the plane is pitching up or down. The MCAS system is not mentioned in the FAA Type Certificate Data Sheet A16WE. Malfunctions in the AOA sensors in the MCAS have been blamed for more recent airline disasters.

38.    The MCAS and other onboard computer systems of the 737-Max would have been alien to a pilot in 1967 flying a 737. This is because onboard digital flight computers were the brainchild of NASA in 1972.

39.    There were no computer systems to speak of before 1972, yet the 737-Max, the 737-700 and the very first 737 which flew in April of 1967 are all considered similar enough to be under a single type certification. The computers, and computer pilot overrides of the 737 MAX 8 were only amendments to the type certification tacked on to the type certification as modifications which were made over time.

40.    Thus, manipulating the concept of type certification eased the barriers to production of new planes for Boeing, and move a new plane quickly from concept to the marketplace.

**C. Self-Certification of Boeing 737 Aircraft**

41.    Boeing has enjoyed a close relationship with the FAA. Over the course of time that Boeing has manufactured and sold the 737 aircraft, the FAA, at the urging of Boeing, has delegated more and more authority to Boeing with respect to aircraft safety and certification.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

42.    In fact, the FAA permitted Boeing to self-certify its own aircraft pursuant to an FAA program called Organization Designation Authorization ("ODA"). The program allows Boeing to self-inspect, self-approve, and self-certify Boeing's own aircraft.

43.    For decades, the FAA allowed Boeing engineers to oversee tests on Boeing aircraft and then vouch for the safety of Boeing aircraft. A self-certification system is at odds with the role of a federal agency as the public's watchdog. Indeed, other agencies have reported disturbing data concerning self-certification.

44.    In 1993, the Government Accountability Office (GAO) reported that Boeing had self-certified 95% of the Boeing 747-400. In the 1990's, the Transportation Department, which oversees the FAA, conducted an audit and discovered that Boeing had inspected and self-certified 95% of the Boeing 777 fleet.

45.    In the global race for market share of commercial aircraft sales, Boeing's relationship with the FAA, and its practice of self-certification, provided a significant advantage.

46.    Self-certification provided Boeing an advantage in time-to-market, but it came at the price of public safety. For example, some Boeing designs were

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

expedient, such as internal wiring instructions that do not specify the tools to use for installation of components, which is a deviation from industry practice.

47.     Self-certification of the Boeing 737 continued through the present Boeing 737 MAX, notwithstanding that the Department of Transportation's Office of Inspector General was warning the FAA that its oversight of manufacturers' work was insufficient.

48.     In the years between the time Boeing launched the Max 8 design in 2011 and the first plane rolled out of production in 2016, the Inspector General criticized the FAA's handling of the "self-certification" system in three successive reports. The federal watchdog said in 2011 that the FAA's system for deciding which technologies carried the highest safety risks was not effective. Investigators also said the FAA had not adequately trained company employees to spot noncompliance with safety requirements. *See* Davis, Aaron "How the FAA Allows Jet Makers to 'Self Certify' that planes meet U.S. Safety Requirements", The Washington Post, Marina Lopez, March 15, 2019.

49.     In 2015, with the first Max 8 under construction, the IG wrote again that those designated to sign off on safety issues were often doing checks "not related to high-risk issues — e.g., issues that could directly impact the potential loss of critical systems or other safety concerns." See, *Id.*

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

50.     The Inspector General specifically singled out the government's oversight of the Seattle-area FAA office that supervised Boeing's certifications. "FAA does not know whether it has adequate staffing levels needed to meet workload requirements," the report read. See, *Id*.

51.     The consequences of self-certification and type certification were felt even in the early 90's with two fatal Boeing 737 nose-dive crashes, a harbinger of future airline disasters.

**D. Boeing 737 Crashes of the 1990s**

52.     The high price of self-certification and type-certification has been paid by air travelers.

53.     On March 3, 1991, a Boeing 737 operating as United Airlines flight 585 was on its turn to complete its final approach to land at Colorado Springs Municipal Airport when the nose pitched down until it reached nearly vertical attitude just before impact.

54.     The National Transportation Safety Board (NTSB) determined the probable cause to be the loss of control of the airplane resulting from the rudder surface being deflected in a direction opposite to that commanded by the pilots as the result of a jam of the main rudder power control unit. There were no survivors.

55.     On September 8, 1994, a Boeing 737-300 crashed while maneuvering to land in Pittsburgh, PA. The NTSB determined the probable cause of the crash to

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

be the same as United Airlines flight 585, loss of control as the result of a jam of the main rudder power control unit. All 132 people on board were killed and the airplane was destroyed by impact forces and fire.

56.    The two tragic 737's crashes became known as the "rudder hard-over" crashes. *See* Wald, Matthew L. "Rudder Flaw Cited in Boeing 737 Crashes" The New York Times, March 24, 1999. The 737's involved in the disasters had been certified with one power control unit and a single rudder panel.

57.    The National Transportation and Safety Board found that Boeing had knowledge of many other similar 737 rudder incidents before the crash of Flight 585.

58.    Upon information and belief, Boeing held a secret meeting on October 8, 1992. In that meeting, Boeing admitted they had a problem.

59.    Pilots had been reporting rudder problems decades earlier. As early as 1969, a service memo cited reports of rudders moving inadvertently. But the reports had not been addressed.

60.    Boeing knew that the FAA was not going to ground the 737, and Boeing would not experience immediate financial consequences. Boeing devised a plan to spread costs out over a number of years rather than immediately fix the problem.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

61.    The National Transportation Safety Board ("NTSB") has oversight over the FAA and Boeing. The NTSB searched for answers to the disasters, and though Boeing was aware of existing problems, the information was not forthcoming. Boeing admitted at a meeting with the FAA in 1992 that part of the Boeing 737 did not meet the "fail safe design intent," yet the NTSB was not appraised of the meeting.

62.    What Boeing admitted privately, they did not admit publicly. Boeing blamed the crash on the Rocky Mountain winds, as did the FAA. The FAA explained that the pilots were unable to control United Flight 585 because the Rocky Mountain produced "rotors," i.e., dangerous high winds.

63.    Other commercial aircraft manufacturers had at least two power control systems for redundancy, in case one failed. Boeing had no such redundancies, so the two flights were doomed if a failure occurred in any part of the system. At that time, Boeing was the only commercial jet in the United States which had only one power control unit ("PCU") and single rudder panel.

64.    The two 737's which nose-dived into the ground had a single point of failure which, when triggered, caused the planes to nose-dive into the ground without regard to the command of the pilots and impossible for the pilots to correct.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

65.     Subsequent to the 1992 meeting between Boeing and the FAA, the September 8, 1994, crash occurred. A Boeing 737 dove into the ground, killing all of the passengers on board. Again, the FAA and Boeing blamed the pilots. However, on that day, there was almost no wind, and the skies were calm.

66.     Following the 1994 crash and subsequent investigation, the NTSB recommended many design changes to the 737 aircraft. Yet, Boeing did not follow the recommendations of the NTSB, but instead recommended that pilots get more training.

67.     Boeing recommended that 737 pilots get special training in "aerobatic maneuvers" in order to counter inadvertent rudder deflections. Even more astonishing, the FAA backed Boeing's recommendation of pilots acquiring more training rather than redesigning the aircraft or fixing the problem.

68.     Mandating additional Pilot training to combat a random rudder deflection at low altitude, would leave the pilot with only a few seconds to make precisely the right moves to save the diving aircraft. According to Boeing and the FAA, Pilots should be able to save the plane from the sudden, unexpected deadly dive.

69.     In response to Boeing's position that the crashes were the result of pilot error, Staff members said that in the case of the two crashes, Boeing's argument would require a pilot to hold the rudder pedal in the wrong position for

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

more than 10 seconds, and for the other pilot to ignore this. *See* Wald, Matthew L. "Rudder Flaw Cited in Boeing 737 Crashes" The New York Times, March 24, 1999.

70.    Despite the public demand for a deeper probe into the 737 crashes to be conducted by a different set of investigators, no such probe ever occurred. Boeing's 737s were never grounded, and the costly expenses of repair or redesign were never incurred. No financial consequences were incurred by Boeing with respect to the 737 crashes of the early 1990's.

71.    Despite the tragic fate of those earlier 737 incidents, Boeing's certification independence has grown under the FAA. According to a 2015 report from the Office of the Inspector General of the US Department of Transportation ("OIG"), Boeing conducted 90% of its own inspections. Moreover, Boeing was exempt from the FAA oversight program. Over 20 years later, the landscape of the airline industry had not meaningfully changed.

72.    In fact, over the years, the relationship between Boeing and the FAA has grown even closer. Many in the FAA, particularly in the Seattle office, were employees or had other contractual relationships with Boeing at one time or another.

73.    Prior to 2009, Boeing nominated its employees who would vouch for the safety of the aircraft in the certification process. Since 2009, Boeing does more

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

than merely nominate its employees, Boeing actually selects those employees. There have been deadly repercussions as anticipated by the National Transportation Safety Board.

74.    In 2011, the Transportation Department inspector general said in a report that the FAA "has not ensured engineers are adequately trained to perform their expanded enforcement responsibilities". This was the same year the Boeing 787 was certified.

**E. Boeing 787 Issues**

75.    After the certification of the Boeing 787, Boeing began delivery of the aircraft to a number of airlines, one of which was delivered to Japan Air Lines in December of 2012.

76.    On January 7, 2013, fire broke out aboard the Boeing 787 operated by Japan Air Lines while it was parked at Boston's Logan Airport. The passengers and crew had departed from the aircraft and a cleaning crew had begun work on the plane. A member of the cleaning crew spotted smoke in the aft cabin of the Boeing 787.

77.    A mechanic then opened the aft electronic equipment bay of the plane, parked at the airport gate, and saw billowing smoke and flames coming from the batteries for the Boeing 787's auxiliary power unit ("APU"). He tried to use a fire extinguisher, but the blaze didn't go out. Firefighters eventually

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

determined the fire was caused by the lithium-ion batteries used by Boeing. *See* Irfan, Umair "How Lithium-Ion Batteries Grounded the Dreamliner" Scientific American, December 18, 2014.

78.    Japan Airlines accepted delivery of the Boeing 787 aircraft 18 days prior to the incident.

79.    On January 16, 2013, a Boeing 787 operated by All Nippon Airways made an emergency landing after a battery malfunction warning.

80.    The two incidents so close in time forced a reaction by the FAA and the entire 737 fleet was grounded.

81.    "Upon investigation, the National Transportation Safety Board said it found a number of design and manufacturing concerns that could have led to the short circuiting, including the presence of foreign debris and an inspection process that could not reliably detect defects". *See* Beech, Eric "Design Flaws Led to 2013 Lithium-Ion battery fire in Boeing 787: U.S. NTSB" Reuters, Tim Kelly, December 1, 2014.

82.    U.S. accident investigators went on to say that the "lithium-ion battery that caught fire aboard a parked Boeing 787 in 2013 in Boston had design flaws and it should not have been certified by the FAA". See Id.

83.    Boeing performed its own safety assessment. Boeing determined that the rate of occurrence of cell venting for the Boeing 787 battery would be about 1

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

in 10,000,000 flight hours. The Boeing 787 that caught fire from the battery had been in service for less than 1% of that time.

84.    After the two incidents in January of 2013, the National Transportation Safety Board faulted the FAA for inadequate testing and failing to catch a design deficiency in the Boeing 787 lithium-ion batteries.

85.    The NTSB also noted that there was insufficient guidance for FAA engineers to use during the type certification process to ensure compliance with applicable requirements.

86.    Eventually, Boeing was required to demonstrate that the Boeing 787's design complied with the FAA's special conditions.

**F. The Corporate Culture of Boeing is Greed**

87.    Boeing professes to put safety first, but the corporate culture says otherwise. The Boeing 787 is manufactured at the Boeing facility in Charleston, South Carolina.

88.    Complaints have arisen from defective manufacturing, debris left on planes and the pressure Boeing applied on its employees to not report violations. Consequently, the Boeing 787 has suffered from poor production and lack of oversight.

89.    Faulty parts have been installed in planes and tools have been left aboard planes.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

90.    Metal shavings and slivers have been habitually left inside the aircraft, often near electrical systems risking electrical shorts and fires. The sharp metal shaving can potentially cut wires. On several planes, dangerous clusters of sharp metal slivers hanging over the wiring that commands the flight controls have been discovered.

91.    Most of the time, complaints were squelched. "Evidence is now trickling out that workers in the troubled Boeing 787 plant in South Carolina were pushed to maintain an overly ambitious production schedule and were fearful of losing their jobs if they raised concerns. This is a textbook case of how the absence of psychological safety — the assurance that one can speak up, offer ideas, point out problems, or deliver bad news without fear of retribution — can lead to disastrous results." *See* Edmondson, Amy C. "Boeing and the Importance of Encouraging Employees to Speak Up", Harvard Business Review, May 4, 2019.

92.    The FAA issued a directive requiring Boeing 787 aircraft to be cleared of metal shavings before they are delivered.

93.    Compliance with such a directive is easily achievable so long as workers clean the interior of the aircraft with a vacuum.

94.    Boeing has faced lawsuits from employees who claimed they were retaliated against for flagging manufacturing mistakes.

95.    As a direct result of Boeing's culture of pushing their employees, ignoring their complaints, and putting profits over the safety of the public, the safety of the passengers aboard the Boeing aircraft has suffered from inferior production and lack of oversight.

96.    Recently released internal emails from Boeing have also shed light into the corrupt culture that pervaded Boeing. See https://www.businessinsider.com/boeing-737-max-internal-emails-staffer-concern-cover-up-2020-1

97.    An email from May 2018 from an employee stated, "I still haven't been forgiven by god for the covering up I did last year. Can't do it one more time. The Pearly gates will be closed…."

98.    In writing about the 737 Max in an instant message, another employee wrote" This airplane is designed by clowns who in turn are supervised by monkeys."

99.    In an email exchange between two employees, the first asked "Would you put your family on a Max simulator trained aircraft? I wouldn't." The second replied, "No."

100.    The culture of concern for profits at the expense of safety at Boeing is not limited to the Boeing 737.

101.   After finding a wrench, bolts and trash inside new planes, the Air Force halted deliveries of the KC-46 tanker, built at the Boeing facility in Everett, Washington. The debris is a safety issue.

102.   Complaints originating from pilots are handled in another way. Over the course of time, pilots who fly for various airlines have expressed concerns about the safety and airworthiness of Boeing 737 aircraft. Although Boeing had actual, or constructive knowledge of such concerns expressed by pilots, Boeing failed and refused to take action to address such concerns of the pilots.

103.   A recent example, upon information and belief, pertains to the Boeing 737 MAX aircraft and a pilot that expressed frustration that some systems, including the MCAS, are "inadequate and almost criminally insufficient" and that the lack of adequate information and training for pilots was "unconscionable."

104.   As a result of the desire for increasing profits, quality control has diminished, resulting in increasingly dangerous, and more frequent, airline incidents. Boeing promotes this culture of speed, systematically ignoring complaints of workers and firing potential whistleblowers.

105.   Boeing has profited from its conduct. On January 30, 2019, Boeing reported profits of over $100 billion for the first time in its history. Boeing delivered a record 806 commercial aircraft in 2018.

106.   Cutting costs and bringing products to market quickly pays lucrative financial dividends and hefty compensation packages for Boeing executives, but the price has been paid in human lives.

**G. A Growing Record of Incidents**

107.   Minimizing certification barriers and promoting a culture of speed over safety leads to errors. And as the record indicates, there have been more and more airline incidents.

108.   On March 3, 1991, as discussed above, a Boeing 737 operating as United Airlines flight 585 became the first of the "rudder hard-over" crashes.

109.   On September 8, 1994, a Boeing 737-300 crashed while maneuvering to land in Pittsburgh, PA became the second of the "rudder hard-over" crashes.

110.   On July 17, 1996, a Boeing 747-131 operating as flight TWA 800, killed all 230 people on board when it plunged into the Atlantic Ocean after takeoff from New York. The NTSB determined that the most likely cause was a short circuit outside of the center wing fuel tank ("CWT"). The NTSB further determined that a contributing factor to the accident was the design and certification concept of the CWT with heat sources located beneath it. See, National Transportation Safety Board. (8/23/2000), Accident ID: DCA96MA070, https://ntsb.gov/investigations/AccidentReports/Pages/AAR0003.aspx.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

111.   On June 28, 2008, a Boeing 767-200 operating as cargo airplane flight 1611 from San Francisco International Airport caught fire before engine start up. The NTSB determined the probable cause to be the design of the supplemental oxygen system hoses and the lack of positive separation between electrical wiring and electrically conductive oxygen system components. The NTSB further noted that contributing to this accident was the failure to install nonconductive oxygen hoses. The lack of positive separation allowed a short circuit to breach a combustible oxygen hose, release oxygen, and initiate a fire in the supernumerary compartment that rapidly spread to other areas. See, National Transportation Safety Board. (6/30/2009), Accident ID: DCA08MA076, https://www.ntsb.gov/investigations/AccidentReports/Pages/AAR0904.aspx.

112.   On December 29, 2010, a Boeing 757-200 flying as American Airlines flight 2253, ran off the departure end of runway 19 at Jackson Hole Airport in Wyoming. The National Transportation Safety Board determined the probable cause of the incident to be in part a manufacturing defect in a clutch mechanism that prevented the speed brakes from automatically deploying after touchdown. See, National Transportation Safety Board. (6/12/2012), Accident ID: DCA11IA015,

https://www.ntsb.gov/investigations/AccidentReports/Pages/AAR1201.aspx.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

113.   On April 1, 2011, a Boeing 737-3H4 flying as Southwest flight 812, conducted an emergency descent after suffering a rapid decompression. An unidentified sound was recorded on the cockpit area microphone. The captain called for oxygen masks as the cabin lost pressurization. A 2-foot hole in the fuselage was observed. The NTSB determined the probable cause to be the improper installation of the fuselage skin panel at the S-4L lap joint during the manufacturing process, which resulted in multiple site damage fatigue cracking and eventual failure of the lower skin panel. See, National Transportation Safety Board. (9/24/2013), Accident ID: DCA11MA039,

https://www.ntsb.gov/investigations/AccidentReports/Pages/AAB1302.aspx.

114.   On January 7, 2013, as referenced above, a Boeing 787 operated by Japan Airlines caught fire while it was parked at the gate at Logan International Airport in Boston. See, National Transportation Safety Board. (11/21/2014), Accident ID: DCA13IA037,

https://www.ntsb.gov/investigations/AccidentReports/Pages/AIR1401.aspx.

115.   On January 16, 2013, as referenced above, a Boeing 787 operated by All Nippon Airways caught fire, as referenced above, due to a malfunction in the lithium-ion battery. See, *Id.*

116.   On September 8, 2015, 170 passengers and crew aboard British Airways Flight 2276, a Boeing 777-236 were forced to evacuate the aircraft in Las

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Vegas when an uncontained engine explosion occurred. Cracks in the high-pressure compressor spool of the engine manufactured by General Electric caused the explosion. Over four years earlier the FAA had warned both Boeing and General Electric about a design flaw in the engine that could result in cracks in the high-pressure compressor spool that could cause the very explosion that occurred and rain debris big enough to set the rest of the plane on fire. Both Boeing and GE knew of the compressor spool issue but took no affirmative steps in 4 years to correct it. If not for the quick-acting pilots who slammed on the brakes as the plane was headed down the runway; the plane, and all those on board, surely would have met with disaster. The NTSB noted in its investigation that a contributing factor to the incident was the lack of inspection procedures. See, National Transportation Safety Board. (10/6/2015), NTSB Issues Second Update on British Airways Engine Fire at Las Vegas, https://www.ntsb.gov/news/press-releases/Pages/PR20151006.aspx.

117.   On August 27, 2016, a Boeing 737-7H4 operating as Southwest Airlines Flight 3472 made an emergency landing 12 minutes after takeoff. The CFM International CFM56-7 engine suffered an uncontained engine failure. Debris from the engine punctured the left side of the fuselage causing a loss of cabin pressure and damaged the wing and empennage. A 5-inch by 16-inch hole was found in the fuselage. This incident could have caused the loss of the entire

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

aircraft and all passengers. See, National Transportation Safety Board. (9/12/2016), Investigative Update Provides Initial Findings in Investigation of Uncontained Engine Failure. https://www.ntsb.gov/news/press-releases/Pages/PR20160912.aspx.

118.    On October 28, 2016, a fire occurred in the right engine of a Boeing 767-323 operating as American Airlines flight 383. NTSB believed the cause to be a manufacturing anomaly. See, National Transportation Safety Board. (1/30/2018), Accident ID: DCA17FA021. https://www.ntsb.gov/investigations/AccidentReports/Pages/AAR1801.aspx.

119.    On October 14, 2017, while travelling from Abu Dhabi to Sydney, the flight crew of a Boeing 777-300 observed a burning smell emanating from an air vent. The plane was diverted to Adelaide. Inspection found that a wiring bundle had been incorrectly routed, allowing it to chafe through the insulation, come into contact with screws and nut plates, and thus short-circuit the wires. Boeing determined that the electrical routing error had occurred during the manufacture of the aircraft. There had been 4 earlier reports involving wire chafing.

120.    On April 17, 2018, a Boeing 737-700, Southwest Airlines Flight 1380, ("Flight 1380") left LaGuardia Airport. Along with the other passengers on board the plane, Mr. Madison, who was travelling to Texas to visit family. Flight 1380 was bound for Dallas, Texas, with the ultimate intended destination of San

Francisco. Within twenty minutes after liftoff, the passengers heard a loud bang as if something on the Aircraft had exploded, or as if the Aircraft had collided with something in midair. The left engine of the Aircraft sustained a catastrophic fan blade failure and self-destructed, and the explosion projected metal fragments at high velocity against the fuselage and shattered a passenger window of the Aircraft. Instantly, the window collapsed resulting in explosive and violent decompression of the Aircraft cabin. The passenger nearest the window was sucked into the opening created by the shattered window and was trapped there in great agony, with her head, arm and partial torso outside the aircraft. Eventually, after great turmoil and anxiety for all onboard, the pilot, utilizing the only remaining engine, was able to bring the Aircraft under control and make an emergency landing at Philadelphia International Airport.

121.  On May 18, 2018, just over a month after the gruesome tragedy of flight 1380, Global Air Flight 972, a Boeing 737 aircraft, crashed shortly after takeoff from Cuba and took the lives of another 112 people.

122.  In October of 2018, Lion Air flight 610 jerked wildly in the air as pilots desperately fought the Boeing navigation system for control of the aircraft. Lion Air flight 610 was a 737-8 MAX.

123.  The investigation currently points to a faulty Angle of Attack (AOA) sensor which was part of the Boeing MCAS system as the cause. There are two

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

AOA sensors on each aircraft so that if one sensor fails, it will disagree with the other sensor and a "disagree" alert will be sent to the pilot.

124.   Though the redundant second sensor and "disagree" alert systems were installed on the planes, Boeing did not activate them. They were merely an option that Airlines had to pay extra for. Airlines believed that they were standard equipment.

125.   Since 2004, AOA sensors had been reported and flagged to the FAA over 200 times on the FAA Service Difficulty reporting site. They were flagged for requiring adjustment, repairing or failing.

126.   Investigators of the Lion Air 610 crash believe the Angle of Attack sensor incorrectly sensed the plane had rolled up, causing the MCAS system to pitch the nose of the plane down. The pilots fought to override the MCAS system over 20 times but lost the battle. The 737 did a nose-dive into the sea, plunging all the passengers and crew aboard to their deaths.

127.   In March of 2019, pilots flying another Boeing 737-8 Max operating as Ethiopian Flight 302 again battled the MCAS. A faulty AOA sensor is again blamed. Again, everyone aboard plummeted to their deaths.

128.   Regulatory agencies around the world grounded the 737-8 Max planes. Well after authorities from around the world grounded the 737-8 Max, the

FAA finally followed suit and grounded the plane. Boeing then announced it would make the "disagree" alert system operational and standard on all the planes.

129.    One issue concerns the slat track assembly. Boeing announced that the 737 MAX and the older model NG may also have faulty parts on the wings that could crack and damage the aircraft while in use. The FAA announced that more than 300 of the Boeing 737 MAX airplanes and an older model 737 may contain such improperly manufactured parts.

130.    In an interview with CBS, Boeing's CEO Dennis Muilenburg claimed that safety is the highest priority of the corporation and apologized to consumers admitting that Boeing had made mistakes. One of those mistakes being that Boeing was aware that the "disagree" light which caused the accident was not active on all flights in 2017 but neglected to inform the FAA for 13 months.

131.    Another mistake was changing the role of the MCAS system without disclosing the changes to the FAA who determined the pilot training needs.

132.    The original MCAS was supposed to only activate in rare high-speed moves, and it relied on multiple sensors before it activated to nudge the plane down. This version of the MCAS, the quiet back up system in the background, was approved by the FAA. After testing the new Boeing 737 MAX pilots discovered that the larger engines of the plane made handling more difficult.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

133.   In response to the critique, Boeing expanded the role and parameters of the MCAS, giving the system more power to pull the plane down harder and allowing it to activate not just in high-speed situations to avoid stalls.

134.   In a rush to get the plane done, the new MCAS system relied on a single AOA sensor.

135.   Since 1990, there have been 1,172 instances of bird strikes on planes, with 122 strikes on AOA sensors. As Boeing rushed to get the plane completed, Boeing never disclosed the changes to the FAA officials who determined pilot training needs.

136.   Under pressure to finish the project, Boeing asked to remove the description of the MCAS system from the pilot's manual, since this would have required more training. The FAA agreed to the Boeing request, believing the MCAS to be the original version. Most MAX pilots were unaware of the existence of the MCAS software on the plane. The MCAS software would now more aggressively take charge of a plane, relying on a single AOA sensor that could be compromised.

137.   To leave the MCAS system in the pilot's manual would have made the plane less marketable as more time would have been required for pilot training.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

138.   Boeing had knowledge of its systemic failure to provide adequate safety for Boeing 737 aircraft; knowledge of its defective and unreasonably dangerous design and manufacture; and knowledge of its failure to provide adequate warnings and safety instructions; and was aware of the enormous cost of such failure in human lives lost and the suffering endured by survivors such as that inflicted upon the Plaintiff in this case.

139.   As the timeline above illustrates, the number and frequency of aircraft incidents continues to increase. The culture, practices, and customs at Boeing keep the company profitable but at the cost of increased risk to the passenger.

140.   Boeing must be held accountable for the enormous harm inflicted upon the traveling public. The facts demonstrate that Boeing only responds to problems once profitability is threatened, or multiple, terrible tragedies.

141.   "What's required, however, is more than operational fixes. It is nothing less than a full organizational culture change. But how telling it is that it takes a cataclysmic event (two, actually) for executives to take culture seriously? And yet, sadly, this is the way a thoroughgoing change in the culture of an organization happens most often: AFTER a big, visible failure or tragic event". Edmondson, Amy C. "Boeing and the Importance of Encouraging Employees to Speak Up", Harvard Business Review, May 4, 2019.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

142.   Boeing has been sued in a class action by its shareholders in which they allege that Boeing has covered up problems with the 737 and that the plane maker "effectively put profitability and growth ahead of airplane safety and honesty." The shareholders are suing Boeing for securities fraud. See Seeks v. Boeing et, al. Case: 1:19-cv-02394 Northern District of Illinois 4/9/2019.

143.   In that suit, shareholders claim that Boeing made false and misleading statements about the company's operations, its growth and its safety record, which inflated its market value.

144.   While public outcry has gone so far as to suggest Boeing executives should be prosecuted for manslaughter, Boeing executives remain insulated. See, Mokhiber, Russell "Why Boing and Its Executives should be Prosecuted for Manslaughter" Counterpunch, April 19, 2019.

> "Two Boeing 737 Max 8 jets have crashed within five months leaving 346 dead. Early evidence of Boeing's wrongdoing in the design of the 737 Max 8 and the company's failure to train pilots to handle its Maneuvering Characteristics Augmentation System (MCAS) warrants a criminal manslaughter prosecution of both the company and the responsible executives.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Boeing CEO Dennis Muilenburg has admitted that "it's apparent that in both flights, the MCAS activated in response to erroneous angle of attack information."

And Boeing kept pilots in the dark about potential failure modes that could result in a taxing mental and physical struggle in the cockpit with just seconds to execute correct decisions and maneuvers.

Pilots complained saying that it is "unconscionable" that Boeing, the Federal Aviation Administration and the airlines had pilots flying without adequate training or sufficient documentation about the MCAS system, that the flight manual "is inadequate and almost criminally insufficient." See, *Id.*

145.    Despite the systematic failures to manage aircraft safety, it was not until December 23, 2019, that CEO Dennis Muilenburg was fired by the company for failures in these critical duties.

146.    Despite the airline crashes and the deaths of hundreds of passengers, Boeing executives have not experienced a decrease in their executive

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

compensation though the Boeing 737- Max has been grounded worldwide for months.

147.    According to Salary.com, Boeing CEO David L. Calhoun's total compensation for the Fiscal Year Ended 2022 was $22,480,396 dollars. *See* https://www.salary.com/tools/executive-compensation-calculator/david-l-calhoun-salary-bonus-stock-options-for-boeing-co.

148.    Chief Financial Officer Brian J. West earned $8,636,041 dollars. See, *Id*.

149.    Executive Vice President and Chief Legal Officer Brett C. Gerry was a paid a salary of $6,176,548 dollars. See, *Id*.

150.    Executive Vice President, President and Chief Executive Officer, Boeing Defense, Space & Security Theodore Colbert III was a paid $6,201,745 dollars. See, *Id*.

**H. Alaska Airlines Flight 1282 Incident**

151.    Alaska Airlines Flight 1282, a Boeing 737 Max 9, took off from Portland International Airport at 5:07 p.m. heading to Ontario, California with one hundred seventy-one passengers and six crew members on board.

152.    Approximately six minutes into the flight and as the aircraft climbed to 16,000 feet a factory installed door plug separated from the airframe.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

153.   The door plug was located at seat 26A. Fortunately, no one was seated immediately next to the gaping hole.

154.   The sudden opening caused uncontrolled decompression throughout the cabin.

155.   Several passengers stated that they heard a loud explosive bang or boom followed by a gust of wind.

156.   The sudden decompression caused a rush of air out of the cabin, ripping the shirt off a child and loose items in the cabin to be expelled through the opening. Additional debris was flying throughout the passenger cabin.

157.   Although the aircraft's oxygen masks were deployed, some did not function properly.

158.   During the excruciating moments following the incident, Ms. King and other passengers endured the horrific fear of a plane crash—suddenly and unexpectedly passengers were facing death. Many passengers texted or tried to call loved ones; others comforted each other; and many others prayed.

159.   The pilots made an emergency descent to 10,000 feet and returned to Portland International Airport where they made an emergency landing at approximately 5:26 p.m.

160.   Interior non-structural damage was observed at rows 1 through 4, 11 and 12, 25 through 27, and 31 through 33, including damage to seat 25A, which

lost its headrest and was itself twisted, and seat 26A, which lost its headrest and seatback cushion as well as the tray table on its rear side.

161.    As a direct result of the frightful, death-threatening failure of the Boeing aircraft, Ms. King suffered severe mental, emotional, and psychological injuries, including post-traumatic stress, and physical injuries. The sudden pressure changed caused some passengers' ears to bleed.

162.    The tragedy of flight 1282 is just one terrible chapter in the evolving story of Boeing and Alaska Airlines placing profits above safety.

163.    Ms. King is just one of the hundreds of victims who suffered through these terrible incidents. There are hundreds more victims and even more recent, deadlier chapters.

164.    Following the incident, The Boeing Company's CEO, David Calhoun stated "We're going approach this number one by acknowledging our mistake. We are going to approach it with 100% complete transparency."

165.    Following the incident Alaska Airlines' CEO Ben Minicucci stated "It makes me angry. Boeing is better than this, and flight 1282 should never have happened."

166.    In their investigation into the Incident, the NTSB confirmed four key bolts were missing when the plane left Boeing's factory near Seattle.

/ / /

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

## I. NTSB ACCIDENT INVESTIGATION AND FINDINGS

167.   The National Transportation Safety Board ("NTSB") immediately launched an investigation pursuant to its authority under 49 U.S.C. §§ 1131–1132. The aircraft was nearly new, having been delivered by Boeing to Alaska Airlines on October 31, 2023.

168.   On February 6, 2024, the NTSB issued its preliminary report (NTSB Aviation Investigation DCA24MA063) concluding that the door plug failure was caused by Boeing's failure to install four critical retaining bolts during assembly. The report stated: *"The four bolts that prevent upward movement of the [mid-exit door] plug were missing before the plug moved upward off the stop pads."* (NTSB Preliminary Report, Feb. 6, 2024, p. 4)

169.   The NTSB further reported that photographic evidence obtained from Boeing showed the left mid-cabin door plug being reinstalled at Boeing's Renton, Washington facility without bolts securing the top two guide fittings and the lower arrestor fittings. (Id. at pp. 4–5)

170.   The NTSB determined that the door plug had been removed on September 19, 2023, during Boeing's internal rework of damaged rivets. After reinstallation, no documentation was produced to show the bolts were re-secured, and Boeing has admitted that such records likely never existed. (NTSB Hearing,

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

Aug. 6–7, 2024; see also CNN, "NTSB says Boeing missing records on work to Alaska Airlines door plug," April 17, 2024)

171.   The door plug, which serves as a structural component of the fuselage, was secured by only secondary fittings and was not capable of withstanding pressurization loads during ascent. The result was a complete structural failure of the panel, leading to an explosive decompression, loss of internal cabin pressure, and injury to passengers and crew.

172.   The NTSB convened a two-day investigative hearing in Washington, D.C., on August 6–7, 2024, to further examine the cause and scope of the failure. At the hearing, testimony revealed that Boeing had no inspection records, work orders, or quality assurance documents verifying that the door plug bolts were ever reinstalled. (NTSB Hearing Transcript, Aug. 6, 2024; reported by Reuters, "Boeing lacked records for Alaska Airlines door plug," Aug. 7, 2024)

173.   Jennifer Homendy, Chair of the NTSB, confirmed under oath that the Board had received no records from Boeing documenting the reinstallation of the door plug. She further confirmed that Boeing failed to comply with standard process control and traceability requirements that are fundamental to aircraft manufacturing. (See NTSB Hearing Transcript, Aug. 7, 2024; CNN, April 17, 2024)

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

174.   These findings are consistent with testimony from whistleblower and former Boeing production manager Ed Pierson, who testified that Boeing's production line was characterized by "chaotic factory conditions," missing documentation, and an "erosion of safety culture." (U.S. Senate Permanent Subcommittee on Investigations, April 17, 2024; see New York Times, "Senate Hearing Examines Boeing's Safety Culture," April 17, 2024)

175.   Based on the NTSB's preliminary findings, it is beyond dispute that Boeing delivered an unairworthy aircraft due to a gross failure of its quality control, safety oversight, and compliance systems—culminating in the near-disastrous structural failure aboard Flight 1282.

176.   Defendant Boeing's conduct in connection with the manufacture, inspection, and delivery of the aircraft involved in Flight 1282 constitutes gross negligence and a conscious disregard for the safety of passengers, flight crew, and the public.

177.   The omission of four critical bolts securing the mid-cabin door plug was not a mere oversight. As the NTSB found, Boeing had no documentation to show the bolts were ever reinstalled, and internal photographs revealed that the door plug was reattached without bolts. (NTSB Preliminary Report, Feb. 6, 2024; CNN, April 17, 2024)

178. Boeing was already under a Deferred Prosecution Agreement ("DPA") with the U.S. Department of Justice stemming from the 737 MAX crashes in 2018 and 2019, which had killed 346 people. Under the DPA, Boeing had represented that it would implement a robust safety and compliance program to prevent further misconduct. (U.S. v. The Boeing Company, No. 4:21-cr-005, N.D. Tex., Jan. 7, 2021)

179. On May 14, 2024, the U.S. Department of Justice informed Boeing that it had breached the terms of the DPA due to conduct arising out of the Alaska Airlines Flight 1282 incident. (See Reuters, "DOJ finds Boeing violated 737 MAX agreement after door blowout," May 14, 2024)

180. The DOJ's determination that Boeing violated the DPA confirms that Boeing's conduct was not merely negligent, but amounted to a knowing or reckless disregard of its safety obligations. DOJ is now weighing criminal prosecution based in part on Boeing's misconduct relating to this very incident. (Id.)

181. Boeing's CEO, David Calhoun, publicly admitted that Boeing was "accountable" for the incident and that the aircraft "must not have left the factory" in that condition. (See NBC News, "Boeing CEO says company is accountable for Alaska Airlines midair blowout," Jan. 24, 2024)

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

182.   This admission confirms that Boeing breached its most basic duty as an aircraft manufacturer to ensure that the products it delivers are airworthy and safe for flight. That the aircraft was delivered in an unsafe, unairworthy condition—due to the total absence of critical structural bolts—reflects a reckless indifference to the health and safety of those who would be placed aboard.

183.   Ed Pierson, a former Boeing manager and whistleblower, testified before the U.S. Senate Permanent Subcommittee on Investigations that Boeing's factory conditions made a major incident inevitable, stating: "*Quite honestly, we were expecting something more tragic.*" (Senate PSI Hearing, April 17, 2024; New York Times, April 17, 2024)

184.   The FAA, in a post-incident audit, found "multiple instances" of noncompliance at Boeing's 737 MAX assembly lines, including process breakdowns, lack of proper documentation, and inadequate quality assurance protocols. (FAA Press Release, March 4, 2024; reported by Bloomberg, "FAA Audit Reveals Lapses in Boeing's Quality Control," Mar. 4, 2024)

185.   In short, Boeing delivered a structurally defective aircraft into commercial service, with full knowledge that its manufacturing and quality control systems were dangerously deficient. Despite prior promises to regulators and the public, Boeing continued to prioritize production output over safety and

failed to implement reforms necessary to prevent precisely the kind of catastrophic failure that occurred on Flight 1282.

186.    The conduct of Defendant Boeing constitutes despicable conduct carried out with willful and conscious disregard for the safety of others, entitling Plaintiff to an award of punitive damages under applicable federal and state law.

## V. CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

### NEGLIGENCE

### (BY PLAINTIFF AGAINST DEFENDANT BOEING; DOES 1-5)

187.    Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

188.    Boeing, in its business of making a profit from marketing and selling aircraft, had a duty to assure that its Boeing 737 Max 9 aircraft were reasonably safe and airworthy for the passengers flying therein whose safety and lives are at risk, including the duty to properly design, develop, test, manufacture, and inspect the aircraft, including component engines, engine containment structure, and passenger window security.

189.    Boeing had a duty to provide manuals, training, warnings and safety instructions for monitoring, inspecting, testing, servicing, maintaining and

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

repairing the Boeing 737 Max 9 aircraft, including component engines, engine containment structure, door plugs, and passenger window security.

190.    Boeing negligently failed to assure that the Boeing 737 Max 9 Aircraft sold to Alaska Airlines and used for Flight 1282, including the door plug was reasonably safe and airworthy.

191.    Boeing negligently failed to provide adequate manuals, training, warnings and safety instructions for monitoring, inspecting, testing, servicing, maintaining and repairing the Boeing aircraft used for Flight 1282, including the door plug for the reasonable safety of passengers.

192.    Boeing's negligence was the direct and proximate cause of the door plug failure on Flight 1282, and the resulting injuries and damages suffered by Ms. King.

193.    As a direct and proximate result of the negligence of Boeing, Ms. King suffered, and will continue to suffer, severe emotional and psychological injuries, including post-traumatic stress, physical injuries and the resulting expenses and damages, the amounts of which are undetermined at this time.

194.    Further, as a direct and proximate result of the foregoing, and as more fully set forth in Part VII herein, Boeing is liable for punitive damages in an amount to be determined at trial.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

195.  By reason of the foregoing, Boeing is liable to Ms. King for compensatory damages, including punitive damages in sums to be determined at trial.

**SECOND CLAIM FOR RELIEF**

**STRICT PRODUCT LIABILITY**

**(BY PLAINTIFF AGAINST DEFENDANT BOEING; DOES 1-5)**

196.  Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

197.  Boeing, in its business of making a profit from marketing and selling aircraft, had a duty to assure that its Boeing 737 Max 9 aircraft, including component door plugs, emergency oxygen supplies, decompression sensors, engines, engine containment structure, and passenger window security, were not defective and unreasonably dangerous for the passengers flying therein, whose safety and lives are at risk.

198.  Boeing had the duty to provide adequate manuals, warnings and safety instructions for its customer, Defendant Alaska Airlines, to monitor, inspect, test, service, maintain and repair the Boeing 737 aircraft, including door plugs.

199.  The Boeing 737 Max 9 Aircraft, including door plugs, sold by Defendant Boeing to Defendant Alaska Airlines and used for Flight 1282 was defective and unreasonably dangerous in design and manufacture, and was

47

defective and unreasonably dangerous with regard to the inadequacy of manuals, warnings and safety instructions for monitoring, inspecting, testing, servicing, maintaining and repairing the aircraft, the door plug, for the safety of passengers.

200.  Defendant Boeing's systemic failure to provide Boeing 737 Max 9 aircraft free of defective and unreasonably dangerous design and manufacture, and failure to provide adequate manuals, warnings and safety instructions, is manifested by horribly tragic crashes, recent ones being Ethiopian Airlines Flight 302 that crashed in Ethiopia on March 10, 2019 and took the lives of 157 people; the Lion Air Flight 610 that crashed in the sea off the coast of Indonesia on October 29, 2018 and killed 189 people; and the Global Air Flight 972 that crashed in Mexico on May 18, 2018 with 112 fatalities.

201.  The compartment failure on fatal Flight 1282 that is the subject of this case was foreshadowed by a similar failure on Southwest Flight 1380, where a window blew out of a 737 Boeing aircraft causing one fatality, and Aloha Airlines flight 243, where a Boeing 737 took off from Hilo, bound for Honolulu, on April 28, 1988. Cruising at 24,000 feet, an 18-foot section of the plane's roof suddenly ripped off, causing an explosive decompression, creating a gaping hole in the fuselage and sucking a flight attendant out of the plane. The Boeing 737 landed safely at Kahului Airport on Maui, but it goes down as one of the most significant events in aviation history.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

202.  Defendant Boeing had knowledge of its systemic failure to provide Boeing 737 aircraft free of defective and unreasonably dangerous design and manufacture, and failure to provide adequate manuals, warnings and safety instructions, for Boeing 737 aircraft, including door plugs, and Boeing was aware of the cost of such failure in human lives lost and the suffering endured by survivors such as that inflicted upon the Plaintiff in this case.

203.  The defective and unreasonably dangerous Boeing 737 aircraft used for Flight 1282, including the door plugs, in addition to the inadequate manuals, warnings and safety instructions from Boeing, were the direct and proximate cause of the door plug failure, and the resulting injuries suffered by Ms. King.

204.  As a direct and proximate result of the foregoing, Ms. King suffered, and will continue to suffer, severe emotional and psychological injuries, including post-traumatic stress, physical injuries and resulting expenses and damages, the amounts of which are undetermined at this time.

205.  Further, as a direct and proximate result of the foregoing, and as more fully set forth in Part VII herein, Boeing is liable for punitive damages in an amount to be determined at trial.

206.  By reason of the foregoing, Boeing is liable to Ms. King for compensatory damages and punitive damages in sums to be determined at trial.

/ / /

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## THIRD CLAIM FOR RELIEF

## BREACH OF WARRANTY

## (BY PLAINTIFF AGAINST DEFENDANT BOEING; DOES 1-5)

207.   Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

208.   Prior to the Flight 1282 incident, Boeing expressly and/or impliedly warranted and represented that the Boeing 737 aircraft, including the door plug, was airworthy, of merchantable quality, both fit and safe for the purpose of commercial air travel for which it was designed, intended and used, and was free from all defects.

209.   Boeing breached said warranty in that the Boeing 737 aircraft used for Flight 1282, including the door plug, was not airworthy, of merchantable quality, or fit and safe for the purposes for which it was designed, intended and used, and was not free from all defects as set forth herein.

210.   Plaintiff, as a passenger of Flight 1282, was an intended third-party beneficiaries of Boeing's warranty.

211.   Plaintiff reasonably relied on Boeing's warranty to their detriment.

212.   As a direct and proximate result of the foregoing, Ms. King suffered, and will continue to suffer, severe emotional and psychological injuries, including

post-traumatic stress disorder, and physical injuries and resulting expenses and damages, the amounts of which are undetermined at this time.

213.   Further, as a direct and proximate result of the foregoing, and as more fully set forth in Part VII herein, Boeing is liable for punitive damages in an amount to be determined by the jury at trial.

214.   By reason of the foregoing, Boeing is liable to Ms. King for compensatory damages and punitive damages in sums to be determined at trial.

## FOURTH CLAIM FOR RELIEF

## FAILURE TO WARN

## (BY PLAINTIFF AGAINST DEFENDANT BOEING; DOES 1-5)

215.   Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

216.   At all relevant times, the Boeing 737 aircraft, including the door plugs, emergency oxygen supply, component engines, engine containment structure, and passenger window security, was being operated and used for the purposes for which it was designed, manufactured, inspected, sold and intended to be used, in a manner reasonably foreseeable to Boeing.

217.   The Boeing 737 aircraft used for Flight 1282 was defective, dangerous, unsafe and not airworthy because of Boeing's defective design,

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

development, testing, manufacture and inspection of the aircraft, including the door plug.

218.   Boeing had knowledge that the Boeing 737 aircraft was defective, dangerous, unsafe and not airworthy as described herein.

219.   Ordinary consumers, including passengers, would not, and did not, recognize the hidden risks of flying aboard the Boeing 737 aircraft which was defective, dangerous, unsafe and not airworthy as described herein.

220.   Boeing failed to warn passengers, and others, of the hidden risks of flying aboard the Boeing 737 aircraft which was defective, dangerous, unsafe and not airworthy as described herein.

221.   As a direct and proximate result of the foregoing, Ms. King suffered, and will continue to suffer, severe emotional and psychological injuries, including post-traumatic stress disorder, and physical injuries and resulting expenses and damages, the amounts of which are undetermined at this time.

222.   Further, as a direct and proximate result of the foregoing, and as more fully set forth in Part VII herein, Boeing is liable for punitive damages in an amount to be determined at trial.

223.   By reason of the foregoing, Boeing is liable to Ms. King for compensatory damages in sums to be determined at trial.

/ / /

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

**FIFTH CLAIM FOR RELIEF**

**ALTERNATIVE PLEADING: FEDERAL STANDARD OF CARE**

**(BY PLAINTIFF AGAINST DEFENDANT BOEING; DOES 1-5)**

224.   Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

225.   In the event the Federal Aviation Act standard of care is judicially determined to be applicable to this case, Plaintiff pleads, in the alternative to other counts herein against Defendant Boeing that may be deemed preempted, the standard of care manifested in the Federal Aviation Act and the applicable regulations promulgated thereunder (Code of Federal Regulations, Title 14, Chapter I) (collectively referred to as the "Federal Standard of Care").

226.   Boeing, in its business of making a profit from marketing and selling aircraft, had a duty to assure that its aircraft, including the component engines, engine containment structure, and passenger window security, were compliant with the Federal Standard of Care for the safety of passengers flying therein, whose lives are at risk.

227.   Boeing had the duty to provide adequate manuals, warnings and safety instructions for its customer, Alaska Airlines, to monitor, inspect, test, service, maintain and repair the aircraft, including the door plug.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

228.   The Boeing 737 aircraft, including the component engine, engine containment structure, and passenger window security, sold by Defendant Boeing to Defendant Alaska Airlines was not compliant with the Federal Standard of Care in design, development, testing, manufacture, inspection and certification, and with regard to the adequacy of Boeing manuals, warnings and safety instructions for monitoring, inspecting, testing, servicing, maintaining and repairing the aircraft, including the door plug, for the safety of passengers.

229.   Boeing's systemic failure to provide Boeing 737 aircraft compliant with the Federal Standard of Care in design, development, testing, manufacture, inspection and certification, and failure to provide adequate manuals, warnings and safety instructions, is manifested by horribly tragic crashes, the most recent being Ethiopian Airlines Flight 302 that crashed in Ethiopia on March 10, 2019 and took the lives of 157 people; the Lion Air Flight 610 that crashed in the sea off the coast of Indonesia on October 29, 2018 and killed 189 people; and Global Air Flight 972 that crashed in Mexico on May 18, 2018 with 112 fatalities.

230.   Defendant Boeing had knowledge of its systemic failure to provide Boeing 737 aircraft compliant with the Federal Standard of Care, and its failure to provide adequate manuals, warnings and safety instructions, and was aware of the cost of such failure in human lives lost and the suffering endured by survivors such as that inflicted upon the Plaintiff in this case.

231.    The noncompliant Boeing 737 aircraft used for Flight 1282, and Boeing's inadequate manuals, warnings and safety instructions, were the direct and proximate cause of the door plug failure, and the resulting injuries suffered by Ms. King.

232.    As a direct and proximate result of the foregoing, Ms. King suffered, and will continue to suffer, severe emotional and psychological injuries, including post-traumatic stress disorder, and physical injuries and resulting expenses and damages, the amounts of which are undetermined at this time.

233.    Further, as a direct and proximate result of the foregoing, and as more fully set forth in Part VII herein, Boeing is liable for punitive damages in an amount to be determined by the jury at trial.

234.    By reason of the foregoing, Defendant Boeing is liable to Ms. King for compensatory damages and punitive damages in sums to be determined at trial.

**SIXTH CLAIM FOR RELIEF**

**COUNT 6 NEGLIGENCE**

**(BY PLAINTIFF AGAINST DEFENDANT ALASKA AIRLINES; DOES 5-10)**

235.    Plaintiff incorporates by reference the preceding factual allegations as if fully set forth herein.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

236.   As a common carrier airline transporting passengers for a fee, Defendant Alaska Airlines had a duty to provide the highest degree of care for its passengers, whose very lives were at risk.

237.   Defendant Alaska Airlines had a duty to reasonably monitor, inspect, test, service, maintain and repair the Aircraft, including the Engine and engine containment structure, to keep its aircraft reasonably safe for its passengers, or to remove from service any aircraft that was not reasonably safe.

238.   Defendant Alaska Airlines negligently failed in its duty to provide the highest degree of care for its passengers whose lives were at risk; and further failed in its duty to provide even a reasonable degree of care for its passengers.

239.   Defendant Alaska Airlines negligently failed to reasonably monitor, inspect, test, service, maintain and repair the Aircraft, including the Engine and engine containment structure, to keep its aircraft reasonably safe for its passengers, and to remove from service aircraft that were not reasonably safe. The decision by Alaska Airlines to stop flying the Boeing aircraft at issue over the Pacific Ocean to Hawaii due to warnings from a cabin-pressurization system — yet keep flying it over land — confirms that the jet should not have been in the air and that Alaska Air knew it had major problems.

240.   Defendant Alaska Airlines' negligence was the direct and proximate cause of the aircraft failure and the resulting injuries suffered by Ms. King.

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

241.  As a direct and proximate result of the negligence of Defendant Alaska Airlines, Ms. King suffered, and will continue to suffer, severe mental, emotional and psychological injuries, including post-traumatic stress disorder, and physical injuries and resulting expenses, losses and damages, the amount of which is undetermined at this time.

242.  By reason of the foregoing, Defendant Alaska Airlines is liable to Ms. King for compensatory damages in sums to be determined at trial.

## SEVENTH CLAIM FOR RELIEF

## ALTERNATIVE PLEADING: FEDERAL STANDARD OF CARE

## (BY PLAINTIFF AGAINST DEFENDANT ALASKA AIRLINES; DOES 5-10)

243.  Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

244.  In the event the Federal Aviation Act standard of care ("Federal Standard of Care") is judicially determined to be applicable to this case, Plaintiff pleads, in the alternative to other counts herein against Defendant Alaska Airlines that are deemed preempted by the Federal Standard of Care, the standard of care manifested in the Federal Aviation Act and the applicable regulations promulgated thereunder (Code of Federal Regulations, Title 14, Chapter I).

245.   As a common carrier airline transporting passengers for a fee, Defendant Alaska Airlines had a duty to provide the Federal Standard of Care for its passengers, whose very lives were at risk.

246.   Defendant Alaska Airlines had a duty to reasonably monitor, inspect, test, service, maintain and repair the Aircraft, including the door plugs, to keep its aircraft reasonably safe for its passengers, or to remove from service any aircraft that was not reasonably safe.

247.   Defendant Alaska Airlines negligently failed in its duty to provide the Federal Standard of Care for its passengers whose lives were at risk.

248.   Defendant Alaska Airlines negligently failed to reasonably monitor, inspect, test, service, maintain and repair the Aircraft, including the door plugs, to keep its aircraft reasonably safe for its passengers, and to remove from service any aircraft that was not reasonably safe.

249.   Defendant Alaska Airlines' failure to provide the Federal Standard of Care was the direct and proximate cause of the uncontained engine failure and the resulting injuries and damages suffered by Ms. King.

250.   As a direct and proximate result of the Defendant Alaska Airlines failure to provide the Federal Standard of Care, Ms. King suffered, and will continue to suffer, severe mental, emotional and psychological injuries, including

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

post-traumatic stress disorder, and physical injuries and resulting expenses, losses and damages, the amount of which is undetermined at this time.

251.   By reason of the foregoing, Defendant Alaska Airlines is liable to Ms. King for compensatory damages, in sums to be determined at trial.

## VI. DAMAGES

### A. GENERAL & SPECIAL DAMAGES (All Defendants)

252.   As a direct result of the frightful, death-threatening ordeal described herein caused by the failure of the Boeing aircraft, Ms. King suffered severe mental, emotional and psychological injuries, including post-traumatic stress, associated pain, suffering and physical injuries resulting therefrom, which are continuing, including past and future medical and other expenses, in amount believed to be in excess of $1,000,000.00.

### B. PUNITIVE DAMAGES

#### 1. Punitive Damages (Defendant Boeing)

253.   Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

254.   Defendant Boeing's systemic failure to provide Boeing 737 aircraft free of defective and unreasonably dangerous design and manufacture, and failure to provide adequate warnings and safety instructions, is manifested by horribly tragic crashes, the most recent being Ethiopian Airlines Flight 302 that crashed in

Ethiopia on March 10, 2019 and took the lives of 157 people; the Lion Air Flight 610 that crashed in the sea off the coast of Indonesia on October 29, 2018 and killed 189 people; and Global Air Flight 972 that crashed in Mexico on May 18, 2018 with 112 fatalities. It has also caused catastrophic economic damages to air carriers worldwide.

255.   Defendant Boeing had knowledge of its systemic failure to provide all models of Boeing 737 aircraft free of defective and unreasonably dangerous design and manufacture, and failure to provide adequate warnings and safety instructions, for Boeing 737 aircraft; and Defendant Boeing was aware of the enormous cost of such failure in human lives loss and the suffering endured by survivors such as that inflicted upon the Plaintiff in this case.

256.   Defendant Boeing's willful, wanton and/or reckless conduct as set forth herein was the direct and proximate cause of the failure and the resulting injuries and damages suffered by Ms. King.

257.   By reason of the foregoing, Defendant Boeing is liable to Ms. King for punitive damages in a sum to be determined at trial. Plaintiff Ms. King is entitled to recover punitive damages from Defendant Boeing pursuant to California Civil Code § 3294(a), which authorizes such damages where it is proven by clear and convincing evidence that a defendant has been guilty of oppression, fraud, or malice. As defined in § 3294(c), "malice" includes

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

despicable conduct carried on with a willful and conscious disregard of the rights or safety of others, and "oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. As alleged herein, Defendant Boeing engaged in such despicable conduct by knowingly designing, manufacturing, and placing into the stream of commerce an aircraft with dangerously defective components, including a door plug known to pose a risk of catastrophic failure; by concealing or failing to disclose such dangers to the public and regulators; and by prioritizing profit and market share over the safety and well-being of passengers, including Ms. King. Such conduct constitutes a willful and conscious disregard of the rights and safety of Plaintiff and the traveling public and justifies the imposition of punitive damages against Defendant Boeing in an amount appropriate to punish and deter similar future misconduct.

## 2. Punitive Damages (Defendant Alaska Airlines)

258.   Plaintiff incorporates by reference the factual allegations in the preceding paragraphs as if fully set forth herein.

259.   Upon information and belief, Alaska Airlines was aware of the safety concerns with the door plug and the imperative need for adequate monitoring, inspection, testing, service, maintenance and repair.

260.   Specifically, prior to the incident on Flight 1282 Defendant Alaska Airlines was aware that the same aircraft experienced pressurization warnings without an explanation on three previous flights.

261.   Alaska Airlines was aware of the pressurization warnings and the dangerous propensity for such catastrophic failure, and the serious, potentially fatal, consequences resulting therefrom.

262.   Upon information and belief, following the three previous pressurization warnings, Defendant Alaska Airlines barred this particular aircraft from flights over water.

263.   Upon information and belief, Defendant Alaska Airlines did nothing to address the known danger inherent in the subject door plug for the protection of passengers on its flights with aircraft that had similar door plugs.

264.   Defendant Alaska Airlines' willful, wanton and/or reckless conduct as set forth herein was the direct and proximate cause of the door plug failure and the resulting injuries and damages suffered by Ms. King.

265.   By reason of the foregoing, Defendant Alaska Airlines is liable to Plaintiff for punitive damages in a sum to be determined at trial. Plaintiff Ms. King is entitled to recover punitive damages from Defendant Alaska Airlines pursuant to California Civil Code § 3294(a), which provides that punitive damages may be awarded where it is proven by clear and convincing evidence that the

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

defendant acted with oppression, fraud, or malice. As defined in § 3294(c), "malice" includes despicable conduct carried on with a willful and conscious disregard of the rights or safety of others, and "oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. As alleged herein, Defendant Alaska Airlines acted with such conscious disregard by knowingly operating an aircraft with unresolved and recurring pressurization warnings; by failing to remove the aircraft from service despite those known safety defects; and by placing the aircraft into commercial operation without ensuring its airworthiness. This conduct placed Ms. King and all other passengers at grave risk and reflects a deliberate choice to prioritize expedience and profitability over passenger safety. Accordingly, punitive damages are warranted to punish Defendant Alaska Airlines and deter similar egregious conduct in the future.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

1. For general damages in an amount to be proven at trial but believed to be in excess of $1,000,000.00;

2. For special damages in an amount to be proven at trial;

3. For exemplary or punitive damages in an amount to be proven at trial;

4. For an award of pre-judgment and post-judgment interest;

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

5. For the costs of suit herein, including reasonable attorneys' fees to the extent permitted by law or contract; and

6. For such other and further relief as the Court deems just and proper.


Dated: July 7, 2025

**POULTER & CO. TRIAL ATTORNEYS, INC.**

Brian Poulter, Esq.
*Attorney for Plaintiff,*
*STEPHANIE KING*

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL

## VIII. DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.


Dated: July 7, 2025                    **POULTER & CO. TRIAL**
                                       **ATTORNEYS, INC.**

                                       _____
                                       Brian Poulter, Esq.
                                       *Attorney for Plaintiff,*
                                       *STEPHANIE KING*

COMPLAINT FOR DAMAGES; DEMAND FOR JURY TRIAL